DILLARD v. COCHRAN et al.

(Court of Civil Appeals of Texas. Austin. Jan. 22, 1913.)

1. ESTOPPEL (§ 48*)—BY DEED—EXTENT.

A grantor is not estopped by his deed from claiming a title by limitation.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 116–118; Dec. Dig. § 48.*]

2. ADVERSE POSSESSION (§ 62*)—POSSESSION BY SURVIVING WIFE.

Where land, constituting the separate property of a husband, was occupied by himself and wife as his homestead, her possession thereof after his death, either in person or by a tenant renting it temporarily, was not adverse to a grantee of a child of the parties.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 324–327, 329–332; Dec. Dig. § 62.*]

3. HOMESTEAD (§ 70*)—PROPERTY CONSTITUTING—SEPARATE TRACTS.

A rural homestead may consist of separate and disconnected tracts of land, provided they do not exceed 200 acres.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 100–103; Dec. Dig. § 70.*]

4. HOMESTEAD (§ 70*)—PROPERTY SUBJECT TO—RURAL AND URBAN HOMESTEAD.

One cannot have both a rural and urban homestead at the same time.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 100–103; Dec. Dig. § 70.*]

5. ADVERSE POSSESSION (§ 63*)—POSSESSION BY HEIR.

Where real estate, constituting the separate property of a husband, was occupied by himself and his wife as his homestead until his death, and after his death a child conveyed the same and thereafter entered into possession thereof, claiming in his own right as against his grantee, his title could ripen into title by adverse possession, though if he took possession under another child, who claimed only an undivided interest, his possession would not be adverse.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 333–357; Dec. Dig. § 63.*]

6. TENANCY IN COMMON (§ 15*)—ADVERSE POSSESSION—ACTS CONSTITUTING.

A tenant in common, who is in possession, cannot acquire title as against the cotenant, unless the latter had notice of the adverse claim; but to prove notice it is not always

necessary to show that the cotenant had actual knowledge of the adverse claim.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. §§ 42–52; Dec. Dig. § 15.*]

Appeal from District Court, Hill County; C. M. Smithdeal, Judge.

Action by B. B. Cochran and others against P. H. Dillard and others. From a judgment for plaintiffs, defendant P. H. Dillard appeals. Reversed and remanded.

Collins & Cummings, of Hillsboro, for appellant. Morrow & Morrow, of Hillsboro, for appellees.

KEY, C. J. Appellees, the surviving widow and children of W. B. Cochran, deceased, brought this suit against P. H. Dillard, Will Dillard, and his wife, Ella Dillard, to recover an undivided one-half interest in 72 acres of land situated in Hill county. The defendants answered by plea of not guilty, the three, five, and ten years' statutes of limitation, and by special answer, alleging that the deed executed by P. H. Dillard, conveying the land in controversy to W. B. Cochran, under whom the plaintiffs claim, was procured by fraud. The deed was in the usual form, and contained a general warranty clause. After hearing all the testimony, the trial court instructed a verdict for the plaintiffs, and, upon the verdict so obtained, rendered a judgment for the plaintiffs; and the defendant P. H. Dillard has appealed and assigns as error the action of the trial court in directing a verdict for the plaintiffs.

The contention is that testimony was submitted tending to show that, after appellant conveyed the land to W. B. Cochran in 1892, he took possession of it, and held adverse possession thereof for more than 10 years before this suit was brought, and that therefore he reacquired title to the land. Without expressing any opinion as to how the issue of limitation should be decided, we hold that the testimony presented that issue, and that it should have been presented to the jury. The proof shows that the 72 acres of land was formerly the separate property of John H. Dillard, the father of P. H. and Will Dillard; that it was the homestead of himself and his wife, the mother of P. H. and Will Dillard, up to the time of John H. Dillard's death, and was thereafter the homestead of his surviving wife, unless she abandoned her homestead right by the acquisition of an urban homestead in the town or village of Peoria, which the testimony tends to show. The deed from appellant to W. H. Cochran was executed in 1892.

The appellant testified that, at the time he executed that deed, he was in jail in Hillsboro, under a conviction for manslaughter; that thereafter he was conveyed to the penitentiary, and remained there until he was released therefrom in 1894; that, at the time he executed the deed, his mother was an inmate of the insane asylum at Terrell, Tex.; that she was discharged from that institution and returned to Hill county a short time before he did; and, among other things, he testified as follows: "I was released from the penitentiary in 1894, and in the meantime my mother had been released from the asylum. She was released just a short time before I was. I saw my mother just as quick as I could come from the penitentiary home. She was here when I got here. I have been occupying the land in controversy since 1894. Most of the time I have cultivated a part of it myself and rented the rest of it. I rented the land to different parties, and collected the rent myself. I have paid the taxes on the land since 1894. I went into possession of that land right soon after I was released from the penitentiary, maybe a couple of months, and maybe not so long. It was rented out for that year; but we got possession of it. I think it was in the latter part of the spring or the beginning of the summer when I got possession of the land. W. B. Cochran is now dead. I think he died in 1893 or 1894, I am not sure, but he died before I came back, and it was in the spring or summer of 1894 when I got possession of the land. Since that time I have never had any particular conversation with Bailey Cochran or his mother or brother or sisters about it. They have never demanded the possession of the land from me until this suit was filed. During all these years, I have claimed that me and Will owned the land. There was a man in the jail with me at the time I signed that deed, whom I now recall. That was W. M. Low, and a negro by the name of Dave Low. They were present when these conversations occurred between me and Col. Booth, in which Mr. Cochran was present. This land in controversy was the separate property of my father. I received $350 for that land, and I owned an undivided interest in 72 acres. I know what the reasonable cash value of the land was at that time. It was worth about $20 an acre. Mr. Cochran was in possession of the land, during the time I was in the penitentiary, from the time the deed was executed until about the summer of 1894. I know the reasonable rental value of that land at that time. It was about $3 an acre for a year, and the two years would be about $6 an acre. The improvements on the place consisted of a box house about 14 feet square, and a side room, and a log house we used as a smoke house, and a couple of log cribs. There was some timber on the land. When I went back into possession of the land, I found all the improvements gone— the house and barn and some things that were in the house. I would say that the reasonable cash market value of all that stuff at that time was $125. When I went

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

into possession of the land, there had been some timber cut off of it; I suppose about $25 worth. Everything we had in the way of household goods was left in the house, and we only got a few of them back. That house and stuff was turned over to Mr. Cochran, and what I got back I got through him, but got nothing like what was left there. I would say that the reasonable cash market value of that stuff which was missing out of the house was $30. I did not mean that I got that stuff back from Mr. Cochran, but from his children. I am still in possession of that land. My mother is dead. She died on the 10th of November."

Said witness testified on cross-examination: "My brother Will did not have anything to do with that land. We both own a one-half interest in it. I do not know where Will was living when I came back from the penitentiary. Since that time, he has knocked around a heap, and has been at home part of the time. His residence was at Peoria, and he lived with me and my mother. That was about a mile and a half from this land in controversy. There was no house on the land. It has been moved off. My mother and I lived at Peoria from the time I came back until she died. Part of the time I rented part of the land and worked part of it, and part of the time I rented it all. I did not pay my mother any part of the rent; but I supported her. She kept house for me, and I made a living for her. I did not make the living altogether off the place. I have been buying and selling cattle. My brother Will has lived at several different places. Last year and year before he lived with me and cultivated part of this land. Will is a man of family now. He married last year. During the years since I came back, Will's home has been at different places. When he was at Peoria, his home was with me and my mother. I believe he has made three crops at that place. I think the year after I came back he stayed with me part of the time. He and I did not work the land together. He always worked it for me, or I rented it to him on the halves. He was not in possession of the land, and I was, and I rented it to him on the halves. I was in possession of it for myself. The way I got possession of Will's land was that mother turned it over to me and by Will's consent. I suppose my mother turned it over to me so I could stay and make her a living. I did not have any agreement with her of that kind. When she came back, we went to keeping house at Peoria, and the land was turned over to me by her, and she stayed with me. I was not claiming to own Will's part of the land. I was claiming to own one-half of it. I had possession of the land all the time. I was rendering it and paying taxes on it. My mother and father lived on it before he died, and they had no other homestead that I know of. My mother turned that land over to me in the fall of 1894. She said it

was mine, and for me to take it and do what I wanted to with it, and she would look to me for her support; and I supported her during her lifetime, and most of the time I cultivated the land. When mother died, Will did not come in and claim an interest in the land. He is a party to this suit now. I recognize his right to a one-half interest in the land. I know that he is an heir to it."

[1] It is not contended that appellant is estopped by his deed from claiming title by limitation; and there are authorities to the effect that a grantor in a warranty deed may acquire title by limitation as against his grantee. 2 Herman on Estoppel, etc., 821; Stearns v. Hendersass, 9 Cush. (Mass.) 497, 57 Am. Dec. 65; Traip v. Traip, 57 Me. 268; Hines v. Robinson, 57 Me. 331, 99 Am. Dec. 772; Franklin v. Dorland, 28 Cal. 180, 87 Am. Dec. 111.

[2-4] Counsel for appellees contend that the undisputed evidence shows that, when appellant took possession of the land in 1894, he did so under his mother, who had the right to the possession and use of the entire tract as her homestead; and therefore his possession was not adverse to the plaintiff's interest in the land, which was subordinate to Mrs. Dillard's homestead right. It is true that the proof shows that the 72 acres of land was the homestead of Mrs. Dillard after the death of her husband; and therefore her possession of the land, either in person or by a tenant renting it temporarily, would not be adverse to the claim of appellees, in the sense required to constitute limitation. It is also true that a rural homestead may consist of separate and disconnected tracts of land, provided they do not exceed 200 acres; but it is equally true that no one can have both a rural and urban homestead at the same time. Swearingen v. Bassett, 65 Tex. 271; Johnston v. Martin, 81 Tex. 21, 16 S. W. 550; Williams v. Willis, 84 Tex. 400, 19 S. W. 683; Laucheimer v. Saunders, 19 Tex. Civ. App. 397, 47 S. W. 543.

[5, 6] In this case there was testimony tending to show that Mrs. Dillard had abandoned her homestead right in the land in controversy by the acquisition of an urban homestead in the town or village of Peoria. But, aside from that question, some of appellant's testimony tended to show that he was claiming in his own right as against appellees; and, if such was the case, we see no reason why his claim was not adverse to the latter. Of course, if he took possession under his brother, who claimed only an undivided half interest, then such possession was not adverse to appellees, who owned the other half interest and were cotenants, unless they had notice of the fact that appellant was claiming adversely to them. However, in order to prove notice, it is not always necessary to show that the cotenant had actual knowledge of such adverse claim. Carr v. Alexander, 149 S. W. 218, and authorities there cited.

Our conclusion is that the judgment should be reversed and the cause remanded, and it is so ordered.